(No. 22420.—

NANCY MARGARET ADDIS, Appellant, *vs.* PEARLE H. GRANGE *et al.* Appellees.

*Opinion filed October 17, 1934.*

128

F. B. BRIAN, (HARRY C. HEYL, of counsel,) for appellant.

L. M. BURKEY, for appellees.

Mr. CHIEF JUSTICE JONES delivered the opinion of the court:

This is an appeal from a decree of the circuit court of Stark county dismissing the bill of complaint for want of equity. The bill as amended charged that complainant, Nancy Margaret Addis, was the owner of certain real estate in Toulon, where she made her home; that she was enfeebled by age and disease; that her daughter Pearle H. Grange, and her banker, E. H. Lloyd, occupied a fiduciary relation toward her; that they conspired to deprive her of said real estate for their own benefit, and while she was ill and unable to know and appreciate the nature of her act they procured a deed from her conveying the property to the defendant Pearle H. Grange. The bill prayed for a cancellation of the deed and for other appropriate relief. All proper parties were made defendants. The cause was referred to a master, who reported the testimony without conclusions of fact or law.

On January 21, 1933, the date of the deed, the complainant was a widow ninety years of age. She was the mother of four children—Frank V. Addis, a son, who died shortly after the date of the deed; Florence O. Boyd, Eva B. Kayser and the defendant Pearle H. Grange, her daughters. For many years she had lived on the property here involved. Mrs. Grange is the wife of Arthur H. Grange, her co-defendant. They, with their daughter, made their home with Mrs. Addis from 1909 until 1926, when they moved to Galesburg. Mrs. Addis was in poor health a

great portion of the time and frequently one or more of her daughters visited her and gave her care and attention. She was the owner of a small amount of personal property, her residence in fee, and a life estate in 240 acres of farm lands. During his lifetime, her son, Frank, aided her largely in the management of her business affairs. She was the executrix of her husband's will and Frank assisted her in the administration of the estate. She did almost all of her banking business at the State Bank of Toulon, where she had been a customer more than twenty years. The above mentioned E. H. Lloyd was connected with that bank for forty years, and on the date the deed was made he was president and the owner of more than twenty per cent of the capital stock. Mrs. Addis frequently consulted him about her business affairs and largely relied upon his judgment and advice. Mrs. Grange and her husband had not been financially successful. She became indebted to the State Bank of Toulon in excess of $9000. She had been the owner of an undivided one-fourth interest in the farm in which her mother owned a life estate but had conveyed that interest to her daughter. She and her husband were unable to pay their grocery bills and current expenses. His creditors threatened to file a petition to adjudge him a bankrupt, and in order to forestall it Mrs. Addis obtained a loan from the State Bank of Toulon for $1500. She became seriously sick in January, 1933, and was confined to her bed over a month. On January 18 she executed a will devising to her four children all of her property in equal shares. Three days later the deed was made. When she recovered from her illness she demanded that her daughter re-convey the homestead to her. Her request was not complied with, although Mrs. Grange and her husband tendered a quit-claim deed conveying the premises to Mrs. Addis for and during her natural lifetime.

There is little controversy over the circumstances surrounding the execution of the deed except as to the mental

condition of Mrs. Addis. The testimony offered by her tends to show that she was mentally incapable of knowing and appreciating her act in executing the deed. The evidence on the part of Mrs. Grange tends to show that her mother did comprehend the business at hand. Many of the facts which are necessary to a decision of this case can be gathered from the evidence of E. H. Lloyd, who was called as a witness by Mrs. Grange. His story is that he was called by telephone to the home of Mrs. Addis by someone, but he was unable to identify the person. He responded to that call and went to her home. She was in bed, and the only persons there besides her were her nurse and Mrs. Grange. He says Mrs. Addis asked the ladies to leave the room, as she wanted to talk to Lloyd privately, and that when they had withdrawn she told him she wanted to make a will giving her home property to Mrs. Grange and dividing all the remaining property among her children in equal shares. She expressed a fear that this would occasion trouble among her children and inquired if he could make a will which could not be set aside. He replied that if her purpose was to give Mrs. Grange the home it would be better to make a deed to that property. Mrs. Addis then said that Mrs. Grange had been kind to her and after her death she wanted Mrs. Grange to have the home. Lloyd said he would prepare both a will and a deed to carry out her desires. He went to his bank, in which his son was employed, and directed him to draw both instruments. Whether the deed was prepared that day or not is uncertain from the record. Lloyd testified he again proceeded to the home of Mrs. Addis and read the will to her and that she stated it was in accordance with her wishes. It was signed by Dr. E. B. Packer, attending physician, the nurse, Minnie R. Gettler, and Dorothy Walker, an employee of the Toulon State Bank. At the time of the trial Miss Gettler was dead. Lloyd furthur testified that on January 21 he went to the home of Mrs.

Addis with the deed and that no one except himself and Mrs. Addis was in the room at the time she signed it. It was acknowledged before Dorothy Walker, an employee of the bank. After the execution of the two instruments they were kept by Lloyd until March 6, 1933, when he delivered them to Mrs. Grange's husband.

The third clause of the will was as follows: "I hereby nominate and appoint Ernest H. Lloyd, of Toulon, Illinois, my closest friend and adviser, to be the executor of this will, and I hereby give him authority to sell, bargain, convey, warrant and dispose of any of my property, real or personal, to the end that this will be fulfilled and executed, giving him also, power to sign any instrument or conveyance or covenant to that end." Lloyd admitted that Mrs. Addis looked upon him as her closest friend, and that he had advised her on business matters, paid bills for her and felt more or less interested in her. The fiduciary relationship between him and her was fully established. It was his duty to protect her, so far as he reasonably could, from an unfair and prejudicial alienation of her property. (*Dowie* v. *Driscoll,* 203 Ill. 480; *Berry* v. *Egan,* 291 id. 377.) His reaction to his duty is disclosed by his own testimony. He stated that he did not think it was any of his business to advise her not to give her home away, but that if he had been her conservator or guardian he might have interfered. He testified he knew "they" (her children) were after everything she had; that he realized she was deeding away the only home she had, but he supposed she could get another one; that he delivered the will to the Granges because he did not want it and was interested in them in a certain way; that when he did turn it over to them he knew there was trouble in the family about it; that when the instruments were executed by Mrs. Addis he took possession of them without her telling him to do so; that he did not know what she expected him to do with them; that she had never told him to deliver them

to anyone; that he did not ask her what he should do with them; that he told the Granges that he had the deed and it was up to them to demand it any time they wanted it, and that he went to the recorder's office with Arthur Grange to have it recorded. His testimony shows an utter lack of fidelity to his fiduciary relationship. The conclusion is inescapable from the facts in the case that he was more intent in putting Mrs. Grange in a position where she would have means with which to pay at least a part of her obligation to the bank than to protect the interest of an aged woman who claimed him as her closest friend.

Shortly after the deed was recorded trouble arose over it. Mrs. Boyd talked with Mrs. Grange about the matter on their mother's porch the latter part of May. Mrs. Grange said she had nothing to do with the execution of the deed, and that she was indebted to Lloyd and he forced it. Mrs. Kayser talked to Mrs. Grange in the presence of Earl Addis. Lloyd came along and took Mrs. Grange and her daughter, Eleanor, down the street. They talked with him, and Eleanor was crying. They came back to where Mrs. Kayser was, and Mrs. Grange said that they had pleaded with Lloyd and that he would not let them give the deed back. Upon the trial Mrs. Grange did not deny these statements, and, in fact, she failed altogether to testify. Lloyd, however, denied that he ever advised her against re-conveying the home to her mother. The bank, shortly afterwards, caused a judgment by confession to be entered on the note which Mrs. Addis had given it to save Arthur Grange from bankruptcy. This fact occasioned protests to Lloyd by members of the family. He then took a note signed by Arthur H. and Eleanor Grange, his daughter, for the amount of the indebtedness and thereupon released the judgment against Mrs. Addis. There is nothing strange in his action in this regard, because he thought Mrs. Addis had no real estate remaining except her life estate in the farm. He thought Mrs. Grange owned

the home and Eleanor owned one-fourth interest in the farm in fee.

It is the position of Mrs. Grange that notwithstanding the fiduciary relationship between her mother and Lloyd and his lack of good faith in obtaining the deed, she was in nowise culpable, as she took no part in the procurement of the deed and knew nothing of its execution until several days thereafter. The record does not show that she was instrumental in causing the conveyance to be made, but that fact cannot give validity to a deed obtained in the manner and under the circumstances this one was obtained. A fiduciary relation and the duties involved are not necessarily legal, but they may be moral, social, domestic or merely personal. (*McCord* v. *Roberts,* 334 Ill. 233.) Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other, and perhaps new, cases might be excluded. Transactions between a party and one occupying a fiduciary relation to him are *prima facie* voidable upon the latter's motion, and, the relation being established, the burden is upon the other party to show an absence of undue influence by establishing that the transaction was in good faith upon his part and was equitable and just between the parties. (*Thomas* v. *Whitney,* 186 Ill. 225.) It is hard to conceive anything more inequitable than depriving a feeble woman, ninety years of age, of the only home she had and bestowing it upon another without any present monetary consideration. If there was an existing moral obligation on the part of Mrs. Addis to specially reward Mrs. Grange for past services and attention, good faith would have required Lloyd to have at least drawn the deed in conformity with what he says were his directions—that is, to see that Mrs. Grange got the home after the death of her mother.

It is immaterial whether Mrs. Grange exercised any undue influence over her mother or not. A court of equity

will look to the circumstances and not to the form of the transaction. It is of no consequence by whom the undue influence was exercised—whether by a beneficiary or an outsider. The effect was the same. Mrs. Addis' property was lost to her, and although Mrs. Grange was the nominal beneficiary of the unfaithful conduct of Lloyd, she stands upon no better footing than he would stand had the deed been made to him direct. The duty is upon the beneficiaries to vindicate the bargain or gift from any shadow of suspicion and to show that it was perfectly fair and reasonable in every respect, and courts will scrutinize such transactions with great severity. (*Schrader* v. *Schrader,* 298 Ill. 469.) In the language of Lord Eldon (Wilm. 64): "Let the hand receiving it be ever so chaste, yet if it comes through a corrupt channel the obligation of restitution will follow it." This rule is essential to justice, otherwise a designing person could escape the consequences of his wrong by causing conveyances to be made to third persons instead of reserving them to himself. It would render it almost impossible ever to reach a case of fraud.

No matter how much aggrieved Mrs. Grange was over the transaction at the beginning, she now claims the benefit of it. She alone could have afforded the remedy for which this proceeding was instituted. Mrs. Addis testified that she had no recollection of executing either the will or the deed. Counsel for both parties have devoted considerable space to arguing over her mental condition. From the very nature of things it could not have been strong. It is admitted she was weak and feeble and was guided in her ordinary business affairs by Lloyd. It is therefore needless to show that she was mentally incompetent to make a deed. The fiduciary relations which existed between her and Lloyd made it incumbent upon Mrs. Grange to show that the transaction was not only free from fraud and imposition but that it was fair and equitable to her. No such showing was made but the con-

trary clearly appears. The confidence which she reposed in Lloyd was betrayed to her detriment and to his advantage. Equity, if invoked, will not permit such a transaction to stand.

But it is said that Lloyd was only an officer of the bank, and that Mrs. Grange's indebtedness was not to him personally but to the corporation. This is an evasive argument. He was president of the bank and its largest stockholder. Its capital stock was $50,000. The Grange loan was almost $10,000. He was deeply interested in having this loan secured or paid.

The decree of the circuit court of Stark county is reversed and the cause is remanded to that court, with directions to enter a decree as prayed for in the bill as amended.

*Reversed and remanded, with directions.*