JOSEFA RIVERA, Plaintiff and Appellee, *v.* HEIRS OF IGNACIO DÍAZ LUZUNARIS, ETC., Defendants and Appellants.

No. 9799. Argued February 1, 1949.—Decided July 5, 1949.

*M. Rivera de la Vega* and *R. V. Pérez Marchand* for appellants. *E. T. Fiddler, José C. González, Tomás I. Nido, Jorge M. Morales, Ramón L. Nevárez, Mario Canales,* and *Andrés Guillemard* for appellee.

MR. CHIEF JUSTICE DE JESÚS delivered the opinion of the Court.

Ramón Pastor Díaz Molinari died on November 4, 1939, leaving an estate of approximately $600,000. His sole and universal heirs were his legitimate son Ignacio Díaz Luzunaris, his acknowledged natural son Ramón Díaz Rivera,[1] and his widow Eustacia Luciano Maldonado. On February 28, 1940 the natural son effected a contract of settlement with his brother before Notary Adolfo Porrata Doria, whereby the former settled all his rights to his share in his father's estate for the sum of $10,000. To annul this settle-

---

[1] The natural son was acknowledged by judgment rendered against the Heirs of Ramón Pastor Díaz Molinari on February 28, 1940.

ment, on January 26, 1945, Ramón Díaz Rivera, who had been previously declared incapacitated to manage his property on the ground of insanity, brought this action, represented by his tutrix his mother Josefa Rivera, against Ignacio Díaz Luzunaris.[2] He alleged that at the time the deed of settlement was executed he was mentally unsound and for that reason incompetent to give the consent for the existence of a contract, required by § 1213 of the Civil Code.[3]

In his answer the defendant denied the mental incapacity of the plaintiff. He alleged that the complaint did not adduce facts sufficient to constitute a cause of action; that the plaintiff was estopped from invoking his incapacity because in the filiation suit, wherein he obtained judgment on the same day he settled his hereditary rights, plaintiff appeared without being represented by a guardian, which according to defendant, induced him to believe that he had the capacity to execute a contract. Finally, he alleged that the action was barred because at the time the complaint was filed, more than four years had elapsed from the consummation of the contract of settlement.

The lower court wrote an extensive opinion overruling all the defenses advanced by the defendant. It summarized the testimony of each witness of both parties and after setting forth its findings of fact, it reached the conclusion that the consent given by the plaintiff, who was a mental weakling,

[2] The action was directed against Ignacio Díaz Luzunaris and against the widow of Pastor Díaz Molinari. As to the widow, it sought the nullity of a contract between her and Ignacio Díaz Luzunaris executed subsequent to the settlement between the two brothers and pursuant to which Ignacio Díaz Luzunaris settled with the widow her rights in her husband's estate. As to this contract, the court dismissed the complaint. Since no appeal was taken from that portion of the judgment, it is unnecessary to make any further reference to it.

[3] Section 1213 of the Civil Code, in so far as pertinent, provides:

"Section 1213.—There is no contract unless the following requisites exist:

"1. The consent of the contracting parties.

"2. .          .          .          .          .          ."

was void because of the undue influence that certain persons, among them his own attorney, had exerted upon him. On this ground it declared the settlement void and consequently rendered judgment for the plaintiff.[4]

██ We can not agree with the lower court that the settlement is void on the ground that it was obtained by "undue influence". The doctrine of undue influence of the common law, with the distinction that we shall shortly discuss, is encompassed within the broad range of "deceit" in the Civil Law, embodied in § 1221 of the Civil Code as follows:

"There is deceit when by words or insidious machinations *on the part of one of the contracting parties* the other is induced to execute a contract which without them he would not have made." (Italics ours.)

Commenting on § 1269 of the Spanish Civil Code, equivalent to our § 1221 and referring to serious deceit (*dolo causante*),[5] Manresa says:

"The essence of this type of deceit is found in the fraud which obtains the consent of the deceived person, wringing it from him or at least influencing him. This is the meaning of the words 'or insidious machinations' to which the statute refers and which encompass false promises, the exaggeration of hopes or benefits, *embezzlement*, misrepresentation of name, capacity *or power*, a thousand ways, in short, of deceit that may induce a contracting party, producing a vitiated consent. . ." Manresa, *Comentarios al Código Civil Español*, vol. 8, (2d ed. 1907), p. 657. (Italics ours.)

---

[4] Before the trial was held in the lower court Ignacio Díaz Luzunaris died. He was replaced as a party defendant by his heirs, who are his legitimate minor children and his widow Eva Lamoutte, and who have taken this appeal.

After the appeal was taken Ramón Díaz Rivera, appellee herein, died and was replaced as the plaintiff by his natural mother, Josefa Rivera.

[5] The commentators and even the Code itself (§ 1222, 1930 ed.) distinguish between the two types of deceit: serious and incidental. The former is that which determines the consent causing, of course, the nullity of the obligation; the latter, the incidental, does not avoid the contract because it is not serious and merely gives rise to compensation for damages. Manresa, *Comentarios al Código Civil Español*, Vol. 8 (2d ed. 1907), p. 658.

Let us now compare the deceit of the Civil Law with "undue influence", as defined in II Restatement of the Law of Contracts, § 497, p. 954 *et seq.*:

"Where one party is under the domination of another, or by virtue of the relation between them is justified in assuming that the other party will not act in a manner inconsistent with his welfare, a transaction induced by unfair persuasion of the latter, is induced by undue influence and is voidable."

It suffices to read Manresa's commentary in order to note that the words "or insidious machinations", within their meaning in the Spanish Civil Law, include the undue influence of the common law.

■ The distinction which we pointed out previously consists in that, under the Civil Law, when the deceit is exercised by a person who is not a party or does not act with the consent or at least with the knowledge, without objection, of the party benefited, the contract is perfectly valid. Naturally, the prejudiced party may claim damages from the third person who deceived him. This doctrine rests on the theory that in such a case the two contracting parties act in good faith and there is no reason for imposing on one of them the consequences of the acts of a third person, whom the other party mistakenly trusted. Nevertheless, Manresa says that the deceit of a third person may cause the nullity of the contract when this deceit results in error by the party deceived. In this case it is the error and not the deceit that vitiates the consent. Manresa, op. and vol. cit., p. 854. But whether the consent is vitiated by deceit or by error, the contract is merely voidable. On the other hand, under the common law, the undue influence even when caused by a third person who is in no way benefited by the contract, vitiates the consent even though without the participation or knowledge of the benefited party. See Annotation, 96 A.L.R. 613.

■ But our discrepancy is not merely a question of semantics. Whether we adopt the name used in the doctrine

of the common law or whether we use the appellation given to it under the Civil Law, the fact is that under our Civil Code, if there is deceit, the contract is not void but voidable. And the action for its annulment prescribes four years after the consummation of the contract, as provided by § 1253 of the Civil Code. So that even if we should agree with the conclusion of the lower court that the settlement is void because of undue influence, which is one of the numerous facets of deceit as defined in § 1221 of the Civil Code,[6] we would have to reverse the judgment and dismiss the complaint, for the reason that at the time it was filed more than four years had elapsed after the consummation of the contract, and for the additional reason that the court did not find that the person who exerted the undue influence acted with the knowledge or consent of the defendant.

■ In the instant case we have seen, and it was held by the lower court, that the consideration for the settlement was "ridiculously inadequate".[7] It is clear that the isolated fact that the consideration for a contract is grossly inadequate is not in itself sufficient evidence to show that the prejudiced party lacked the necessary mental capacity to give his consent, which is an indispensable requisite for the existence of a contract. But there is no doubt that grossly inadequate consideration is an important factor in persuading the courts to examine the condition of the prejudiced party in order to determine whether in effect he is mentally incompetent as alleged in the complaint herein.

■■ Before proceeding to an examination of the evidence it is desirable to establish the legal test for determining whether valid consent was given. Section 1215 of the Civil Code provides that lunatics or the insane can not give con-

---

[6] Deceit includes deception, fraud, false representation and undue influence, with the limitation explained above.

[7] Defendant himself, upon filing the inheritance tax return, stated that the share in the estate corresponding to the plaintiff was $76,053.21.

sent.  It is appropriate to pose this question: Is the insane or demented person as defined in § 1215 of the Civil Code, also insane from the point of view of a psychiatrist, as understood by the lower court?  This is not the test for determining contractual capacity.  The rule to be followed in civil cases is to determine whether the party, mentally ill by reason of his disease, has sufficient mental capacity to understand the particular transaction before him, considered in all its aspects.  The party may be insane from the standpoint of the psychiatrist, and yet be mentally competent to understand the scope of a particular transaction.  Hence, § 180 of the Civil Code, in dealing with the tutorship of insane persons, provides that a tutor shall not be appointed for insane or demented persons, when of age, without a previous declaration that they are incapable of administering their property.  This logically implies that a tutor may not be appointed for an insane person who is competent to administer his property.  If the statute prohibits the appointment of a tutor for a person who is competent to administer his property, we must conclude that this is so because it recognizes his legal capacity to contract.  For this reason, in commenting on § 1213 of the Spanish Civil Code, equivalent to § 180 of our Code, Manresa says:

"The exception made by this Section is perfectly logical.  It must first be proved that there is need of a tutorship, and it is clear that such tutorship is not necessary unless the insanity, mental derangement or deaf-muteness *is of such a degree as to render the patient incompetent to administer his property,* which fact must be legally established."  Vol. 2 (3d ed. 1907), pp. 203–4.

And to that same effect, Scaevola says:

"The same is true of the insane person who is not violent . . ., of a monomaniac who is self-controlled and a good administrator of his property, and who only departs from the natural trend of thought or emotion when the mania exerts its influence on his intellect.  Why should this person be subjected

to a permanent tutorship if he is capable of administering his affairs? To be sure, his relatives who are authorized by law to apply for a declaration of incapacity would, upon noticing that he squandered his money or neglected his estate because of his insanity, promptly exercise their rights.

"*A judicial declaration of insanity entails such transcendental consequences that a legal proceeding, with complete proof of said incapacity, has always been required.*" Scaevola, Spanish Civil Code, vol. 4 (3d ed. 1893), p. 222. (Italics ours.)

Elaborating further on this subject, in commenting on § 1263 of the Spanish Civil Code equivalent to § 1215 of our Code, Manresa contends that a contract made by a child is not merely voidable but void, because his limited mental development does not permit him to understand the transaction. He cites with approval the decision of the Supreme Court of Spain of November 6, 1858, where it was held that it was in keeping with the law to declare void a contract executed by a person in a state of intoxication. Commenting on this decision which he regards as highly important, he says:

"The Code is silent as to this particular, but since the old legislation under which this doctrine was created is also silent and since the legal grounds upon which it was framed are permanent, we believe that in disposing of the case it would be decided in a like manner, and still more so, if it is borne in mind that the silence of the law may be explained by the convenience of not establishing an inflexible rule for a matter greatly varying in degree and influence such as intoxication. Although, of course, it will have to be distinguished according to the facts of each case, from libations, which do not deprive a person of reason without any annulment effect, to the highest degree of intoxication which completely enfeebles the faculties and almost extinguishes the consciousness of the acts, reserving for the latter the nullity of obligations thus contracted." Op. and vol. cited, p. 641.

Therefore, if Ramón Díaz Rivera, by reason of his illness—which as we shall hereafter see began in his tender years—had his mental faculties so enfeebled that he could

not understand such an important transaction, we must conclude, applying the aforesaid doctrine, that the consent which he gave was the same as that which would be given by an individual whose mind was enfeebled by intoxication or by lack of development due to his tender age.

The same test is applied in the common law. The article entitled "Proof of Mental Incompetency and the Unexpressed Major Premise," by Milton D. Green, published in 53 Yale Law Journal, pp. 271, 275, says:

"The operative fact to be proved is mental incompetency— not insanity. From a medical point of view a person may be mentally ill or insane. But from a legal point of view, *such mental illness or insanity is immaterial, that is, not an operative fact. As an evidential fact, it may give rise to an inference of mental incompetency, depending upon the type and severity of the mental illness; but it is well established that mere proof of mental weakness or insanity is not enough to invalidate an agreement or a will.* In order to constitute mental incompetency the mental disorder must be such as to destroy the capacity of the party to understand the questioned transaction in particular." (Italics ours.)

Having established the criteria for decision, we shall now examine the findings of fact of the lower court and determine if they show whether the plaintiff's mental capacity was sufficient to understand the important settlement he made with his brother.

The lower court found:

1. That on or about the year 1938 Dr. Rafael Muñoz Vázquez examined the plaintiff at the request of his mother Josefa Rivera, in order to commit him to the Insular Insane Asylum; that as a result of the information supplied by her and from questions put to him by the doctor, the latter reached the conclusion that plaintiff's condition was the result of syphilis of the brain; that he noticed symptoms of schizophrenia and those of a man who could be mentally unsound.

2. That plaintiff at one time tore off all his clothes and remained naked and on another occasion bought a mare and tried to teach her to live without eating; that with the money from the settlement he began to buy automobiles and then wanted to destroy them with a frame saw; that he purchased a motorcycle and rode it for three whole days and nights, selling it later for $300 although it cost him $700; that he often went to the airport, flew in airplanes and later averred that he himself had driven them; that he was known by the nickname of "Popeye the loco"; that he constantly said that when he received the money from his inheritance he would buy a motorcycle and an airplane; that plaintiff settled his hereditary rights for the sum of $10,000 of which he received $5,000 and the other $5,000 went to his attorneys.

3. That, according to the testimony of Dr. José R. Maymí, a psychiatrist, and a graduate of Johns Hopkins University, the plaintiff suffered from oligophrenia which is a form of mental deficiency; that he was not a competent man; *that he was mentally incapable of understanding a financial transaction involving thousands of dollars, as he could not estimate the true value of money and that this condition dated from the early years of his life;* that the plaintiff has the mental age of 12 years, with an intelligence quotient of 75 per cent of normal intelligence; that the United States Army requires a mental age of 12 years [8] and that Ramón Díaz Rivera was an imbecile of high degree reaching the limits of a moron, but that he can not be considered *psychiatrically insane;* that he was not insane at the time of the trial, but had been so on two previous occasions; that he suffered from syphilis and gave a positive in the Wasserman test.

4. Believing the testimony of Dr. José D. Jiménez, the court found proved that the plaintiff had a mental age of 12

---

[8] In his testimony the expert witness testified that if Ramón Díaz Rivera would have gone into the Army he would have been discharged immediately.

years of age and one month; that he was within the range of the feeble-minded or stupid and the moron; that he is a mental weakling, a very emotional person and sensitive to any stimulus and also that he is very impressionable and of low intellect. This witness admitted, as found by the lower court, that if before losing his money he purchased automobiles in order to convert them into airplanes, he showed very poor judgment and *he would presume that he was mentally ill;* that as to the incident of wanting the horse to live without eating, he would say that that was entirely absurd and that the person was completely abnormal; that to attack his mother violently showed abnormality; that Ramón Díaz Rivera was a person who responded to impulses, a hasty person and that his memory was defective; that it was his opinion *that he could make decisions to his disadvantage.*[9]

5. On the other hand the lower court found that the plaintiff, while he was a boy, ran errands and loitered around the Guayama theater; that he was a very willing sort of person, and went up to the second grade in the elementary school, and after receiving the money from the settlement, he obtained a license to drive motor vehicles in Puerto Rico, after having passed written and practical examinations in the Division of Automobiles in the Department of the In-

---

[9] We should bear in mind that Dr. Jiménez, when testifying as expert for the defendants, testified that the psychometric test to which plaintiff was submitted revealed the notable defect that he had for remembering the months of the years; that at times he remembered them well and at other times committed errors, and that when he was asked what month preceded the other he almost always answered the following month; that his memory was defective, but defendants' witness tried to explain this mental condition of the plaintiff on the theory that he got the impression that the plaintiff did not listen to the questions because he was not interested in living facts of his past life; that the answers which he gave were not always responsive; that the plaintiff showed no mental fatigue or slowness, but rather a tendency to be hasty in his answers; that he knew how to appraise situations *at times* complicated, *but does not give the impression of having a profound knowledge of the matters* involved; that the witness would say that the plaintiff is perfectly aware of a situation but does not like to study or analyze it.

terior. Notwithstanding this, the court found that the plaintiff was anxious to obtain the money principally to acquire an automobile, a motorcycle or an airplane and that the day before the transaction his attorney facilitated his efforts to obtain a license to drive motor vehicles in the Island.

In our opinion, the standard applied by the court is erroneous. The test should not have been whether plaintiff was insane from the standpoint of the psychiatrist. It is true that none of the witnesses for the plaintiff expressly testified that on February 28, 1940, when the deed of settlement was signed, he was insane. But we have seen from the evidence presented in this case, expert as well as opinion evidence of persons who observed the conduct of Ramón Díaz Rivera, that the court found proved that his mental illness was permanent and that his lack of capacity existed at all times from an early age. Among the witnesses for the defendant who testified as to his mental capacity at the time he signed the deed of settlement on February 28, 1940, is Attorney Adolfo Porrata Doria. Naturally, he had a marked interest in upholding the mental capacity of the plaintiff to execute the contract which was made under his advice and from which he benefited. The best refutation of his testimony is the finding of the court that when executing the contract for professional services in the filiation suit, Attorney Porrata Doria was not satisfied for that contract to be signed by Ramón Díaz Rivera alone, but required his mother Josefa Rivera to sign it also, in spite of the fact that the plaintiff was at that time of legal age and his mother had no pecuniary interest in the result of the suit. To this effect, we repeat the question posed by the trial court: "Why did he think it was necessary for the mother of Díaz Rivera to sign the contract, in spite of the fact that he was of legal age? Who knows if he knew that Ramón was incompetent, a mental weakling." Another of the witnesses who was present at the signing of the deed, was Attorney Ismael Anglade. He

says that the plaintiff acted like a normal person; yet he testifies that when he was going to sign the contract and Attorney Porrata Doria contended that $10,000 was an inadequate amount, the plaintiff himself interrupted him to say that it was sufficient. We know that the amount received by him was inadequate so that, in view of the evidence set forth, the plaintiff's attitude at that time, when any normal person would have tried to cooperate with his attorney in order to get a better offer, shows that the plaintiff was not acting, at that moment, as a normal person would have done in defense of his own interests. In our opinion, the lower court committed manifest error in not holding that the deed of settlement was void for lack of capacity of the plaintiff to give his consent.

██ It is desirable to point out that the lower court found that the judgment in the filiation suit was obtained on the basis of a settlement concerning civil status. It based its conclusion on the fact that on January 18, 1940 the two brothers had signed a contract by virtue of which Díaz Luzunaris obligated himself not to raise any obstacle in the filiation suit; and that it was also stated in the deed of settlement of February 28, 1940 that the consideration for settling the rights of the natural son was $10,000, as well as not having raised any obstacles in the filiation suit. Before entering into a discussion of this matter, we should not lose sight of the fact that the prohibition against compromising civil status is a limitation on the right of free contracting and as such it must be strictly construed. *Ex parte Santiago et al. and The People*, 21 P.R.R. 359. It is significant that appellees themselves, the only ones prejudiced by the judgment of filiation, assign as an error the finding that there was a settlement concerning civil status. They maintain that there was none and explain their position in their brief, thus:

"But the bare fact in this case that Ignacio Díaz would not raise any obstacles or difficulties against the entry of a judgment was, and should be considered in law, as proof of his adherence to the statute governing the matter of filiation."[10]

Indeed the judgment of filiation was not entered on a stipulation of the parties to that effect, but on the evidence offered by the plaintiff, which the court heard and weighed, entering judgment on the merits. It is true that the defendant in the filiation suit did not offer any evidence and that on cross-examination counsel merely asked plaintiff's witnesses some trivial questions. Was the defendant in any way bound to oppose the complaint of filiation? If he actually

---

[10] It is advisable to point out that in 1911, when plaintiff was three years of age, Josefa Rivera, in her capacity as mother with *patria potestas*, brought a filiation suit against Ramón Pastor Díaz Molinari, and on January 12, 1912, obtained a judgment of filiation. The jugdment was reversed by this Court and the case remanded for a new trial on the ground that the lower court erred in not admitting certain evidence offered by the defendant to the effect that the plaintiff's mother had had relations with other men at the time the child could have been conceived. *Rivera v. Díaz*, 19 P.R.R. 524. For reasons unknown to us, the new trial was not held until February 28, 1940. But with regard to the evidence offered and not admitted in the first trial, it is significant that on December 12, 1912, Ramón Pastor Díaz Molinari, Pedro G. Goyco, and Attorney Luis Abella Blanco, who acted by mutual agreement, were convicted by the District Court of Guayama of the crime of conspiracy and sentenced to serve one year in jail. The offense was that Ramón Pastor Díaz Molinari, in conspiracy with Goyco and his attorney, induced a certain Ramón Jiménez, upon payment of $25, and without the latter having had any relations with Josefa Rivera, to acknowledge by public deed Ramón Díaz Rivera, at that time a minor, as his son. Ramón Jiménez and Josefa Rivera appeared as parties to said deed and stated that Ramón Díaz Rivera was their child. This deed was prepared by said attorney, in agreement with Ramón Pastor Díaz Molinari. Taking advantage of the fact that Josefa Rivera did not know how to read or write, although she knew how to sign, they deceived her by telling her that by that deed, Ramón Pastor Díaz Molinari was acknowledging her son, all of which was done with the object of making her sign the instrument, thereby depriving the child of his right to establish his status as acknowledged natural son of Ramón Pastor Díaz Molinari. By virtue of this deceit the mother signed the deed. This combined action by Ramón Pastor Díaz Molinari, Goyco and the said attorney, gave rise to the sentence on a charge of conspiracy, which was affirmed by this Court. *People v. Díaz et al.*, 22 P.R.R. 177; *In re Abella*, 25 P.R.R. 694.

It is not strange, therefore, that the defendant, being aware of these antecedents, should not raise any obstacles to the filiation of the plaintiff.

had no probabilities of success and was convinced that the plaintiff was right, was it not more profitable for the defendant to avoid a useless contest and thereby obtain a better settlement of the hereditary rights of the natural son? It seems to us that if the testimony which was before the court—which no one has even insinuated was false—warranted the judgment and the court, in rendering judgment, was not aware, as revealed by the record, of the existence of the agreement of January 18, 1940 when it entered judgment, it could not have been influenced, in disposing of the case, by the prior settlement between the parties, but it simply acted in accordance with the evidence presented to it. In addition, we must bear in mind that the plaintiff was mentally incapacitated to execute a contract, and this being so, the alleged settlement of January 18, 1940 is not a weapon that may be brandished to the prejudice of his interest and in favor of whomever was benefited by reason of plaintiff's incapacity.

██. Another error assigned by the appellant is that the lower court accepted as valid the appointment of tutrix in favor of Josefa Rivera, by virtue of which she filed this action on behalf of her son. The tutorship was challenged on the grounds that the appointment had not been registered in the book of tutorship, that the incompetent was not legally notified of the proceeding and that the district attorney did not appear in defense of the alleged incompetent. But the lower court found that the incompetent was present at the hearing and was aware of the proceeding; that the statute does not require the presence of the district attorney as an indispensable requisite for the validity of the proceeding; and finally that the tutorship was registered in the appropriate book. In our opinion the court did not err in upholding the validity of the appointment of the tutrix.

██ The contention that the complaint is insufficient is predicated on the fact that it does not allege that the plain-

tiff was willing to restore to the defendant the $10,000 which he received by virtue of the settlement whose nullity is now sought. It is true that § 1255 of the Civil Code provides that when the nullity of an obligation has been declared, the contracting parties shall restore to each other the things which have been the object of the contract with their fruits, etc., and § 1256 prescribes that when the nullity arises from the incapacity of one of the contracting parties, the incapacitated is not bound to make restitution except to the extent that he was enriched by the thing or the sum whenever received; but as a matter of fact the defendant at all times owed to the plaintiff, as part of his inheritance, an amount greater than the $10,000 which he received. Hence, not even after a judgment decreeing the nullity of the settlement, would the plaintiff be obligated to return any sum to the defendant, but, on the contrary, he would be entitled to receive from the latter the remainder of his legal portion. Nor did the lower court err in deciding that the action was not barred by prescription. Pursuant to the complaint and the evidence the settlement was void for lack of consent, and the action to decree nullity never prescribes.

Appellant has assigned other errors of so little substance that they do not warrant discussion. Among them is the contention that the plaintiff ratified the settlement of his hereditary rights by merely accepting the $10,000 in payment of his inheritance.

Although for reasons different from those set forth by the lower court, the judgment appealed from must be affirmed.[11]

Mr. Justice Marrero did not participate herein.

---

[11] In view of the facts disclosed by the record with regard to the participation of Attorney Adolfo Porrata Doria, the Fiscal of this Court will be ordered in due time to conduct an investigation of the professional conduct of said attorney.

Mr. Justice Snyder, concurring.

I agree that the lay and medical testimony was sufficient to support a finding that Ramón Díaz was insane when he executed the deed of settlement. Consequently, if the district court had entered judgment for the plaintiff based on a finding of insanity, I would vote to affirm on that ground.[1] But I cannot agree that the lower court committed manifest error in not finding that Ramón was insane on that date. On the contrary, I cannot see how we are empowered to say that the district court was compelled to reject the·ample testimony that Ramón was eccentric, stupid and semi-moronic rather than insane. In addition, even if I were able to say that the lower court had committed manifest error in· weighing the evidence, I am not in agreement with some of the reasoning of the majority opinion in its discussion of insanity.[1a]

On the other hand, I believe the judgment should be affirmed on the ground of undue influence. I am unable to agree with the majority of the court that deceit as defined in § 1221 of the Civil Code includes undue influence and that the only difference between the two concepts is that unlike undue influence under deceit a contract may not be avoided because of the machinations of a third person. On the con-

---

[1] See *Fuentes* v. *Federal Land Bank*, 64 P.R.R. 193; *Heirs of Gómez* v. *Colón*, 63 P.R.R. 99; *Valiente & Co.* v. *Heirs of Fuentes*, 45 P.R.R. 600, affirmed in 76 F.(2) 78 (C.C.A. 1, 1935); *Heirs of Cabrera et al.* v. *Aponte*, 29 P.R.R. 874; *Caballero et al.* v. *Pomales et al.*, 17 P.R.R. 691. Cf. *Fisher* v. *United States*, 328 U.S. 463; *Waialua Co.* v. *Christian*, 305 U.S. 91; *Lohman* v. *Sherwood*, 26 S.E.(2) 74 (Va., 1943); *Mills* v. *Shepherd*, 157 P. (2) 533 (Kans., 1945); *Hanks* v. *McNeil Coal Corporation*, 168 P.(2) 256 (Colo., 1946); 1 Williston on Contracts, Rev. ed., § 256, pp. 753–55; Green, Public Policies Underlying the Law of Mental Incompetency, 38 Mich.L. Rev. 1189; Green, Judicial Tests of Mental Incompetency, 6 Mo.L.Rev. 141; Green, The Operative Effect of Mental Incompetency on Agreements .and Wills, 21 Tex.L.Rev. 554; Green, Proofs of Mental Incompetency and the Unexpressed Major Premise, 53 Yale L.J. 271.

[1a] I agree that the test of insanity for civil cases is to determine whether the contracting party was so mentally ill that he was unable to understand the specific transaction; but I am not in accord with the discussion in the majority opinion of § 180 of the Civil Code.

trary, undue influence is a wholly different concept from deceit and is not encompassed by the latter. I agree that as defined in § 1221, deceit is an exceedingly broad term. *Rivera* v. *Hernández*, 44 P.R.R. 343. But in deceit consent is voluntarily given, although fraudulently induced. This contrasts with undue influence, which as we shall see may or may not be fraudulent, but in which there is no consent because the transferor has not acted voluntarily. Cf. *People* v. *Marrero*, 69 P.R.R. 337. The difference between the two concepts is therefore exceedingly important and not a mere matter of semantics or labels.

I do not believe that § 1217 of the Civil Code prevents us from holding that a contract may be avoided for undue influence. It is true that § 1217 provides that "Consent given by error, under violence, by intimidation, or deceit shall be void." But the grounds for finding a lack of consent are not confined to those listed in § 1217. On the contrary, if there has been no voluntary consent because of undue influence, there has been no compliance with the requirements of §1213.

I am aware of the argument that ordinarily lack of consent makes a contract nonexistent, whereas a contract obtained by undue influence is voidable at the option of the victim. But this seeming departure from logic has been made in insanity cases, both in the civil and common law, in order to achieve substantial justice. Cf. *Fuentes et al.* v. *The Federal Land Bank*, *supra*, p. 206; 1 Williston on Contracts, Rev. ed., § 251, p. 741 *et seq.* Just as in the insanity cases, I believe the victim in an undue influence case may assert the contract is "void", whereas the other party to the contract may not be heard to raise this question.

It is difficult to give a precise definition of undue influence. Restatement, Contracts, Vol. II, § 497, p. 954, provides that "Where one party is under the domination of another. . . a transaction induced by unfair persuasion of the latter, is induced by undue influence. . .". On final analysis, every case

depends on its own facts. And the "ultimate question is whether a free and competent judgment was merely influenced, or whether a mind was so dominated as to prevent the exercise of an independent judgment." 5 Williston on Contracts, Rev.ed., § 1625, p. 4540. See *Egr* v. *Egr*, 131 P.(2) 198 (Ore., 1942); *Trustees of Jesse Parker Williams Hosp.* v. *Nisbet*, 14 S.E.(2) 64, 79 (Ga., 1941); *Bliss* v. *Bahr*, 87 P.(2) 219 (Ore., 1939); *Rondous* v. *Erb*, 4 A.(2) 468 (Md., 1939); *Carr* v. *Sacramento Clay Products Co.*, 170 P. 446 (Calif., 1917); Note, Undue Influence in Intervivos Transactions, 41 Col.L.Rev. 707; Green, Fraud, Undue Influence and Mental Incompetency, 43 Col.L.Rev. 176.

It is true that undue influence is not mentioned specifically by name in our Civil Code. But it does not follow that relief from contracts obtained by undue influence may not be had in this jurisdiction. In recent years this Court has not hesitated to borrow from the common law. *Ruiz* v. *Ruiz*, 61 P.R.R. 794 (constructive trust); *López* v. *South P. R. Sugar Co.*, 62 P.R.R. 227 (accord and satisfaction). The consent envisaged by § 1213 of the Civil Code means consent freely given. Consent given under undue influence does not meet this test. The plaintiff may therefore sue to declare such a contract null even under the civil law. See *Suárez et al.* v. *El Banco Territorial y Agrícola*, 16 P.R.R. 599, 604; *Cruz* v. *López et al.*, 17 P.R.R. 40, 44; Holstein, Vices of Consent in the Law of Contracts, 13 Tulane L.Rev. 560, 573, footnote 248. Cf. *Succession of Molaison*, 34 S.(2) 897, 903 (La., 1948), commented on in 23 Tulane L.Rev. 250.

In seeking to determine if undue influence was exerted on Ramón, the lower court first considered his mental condition. This was a proper approach, as feeble-mindedness of the transferor, although not sufficient in itself, is highly material on the issue of undue influence. *Allore* v. *Jewell*, 94 U. S. 506; *Lohman* v. *Sherwood, supra; Floyd* v. *Green*, 188 So. 867 (Ala., 1939); *Griffin* v. *Mays*, 82 P.(2) 836

(Okla., 1938); 5 Williston, *supra* § 1625A, p. 4542; 1 Id., § 256, p. 274.

In weighing the evidence on the issue of undue influence, the district court concluded that Ramón was a "mental weakling".[2] The record contains abundant testimony in support of this finding. I therefore accept it.

The lower court next sought to determine if Ramón received adequate consideration in the settlement. Here again it acted properly, as a showing of inadequate consideration has great weight on the question of undue influence. 5 Williston, *supra*, § 1625A, pp. 4541-2; Restatement, Contracts, Vol. II, § 497, p. 955, Comment b; *Hanks* v. *McNeil Coal Corporation, supra; Floyd* v. *Green, supra.*

In arguing that the consideration received by Ramón was adequate, the appellants set forth ten grounds. Some of these grounds appear in the deed of settlement. Some appear in the testimony of Adolfo Porrata—the attorney who represented Ramón in negotiating and executing the deed of settlement—although not in the deed. And some appear for the first time in appellants' brief. In its opinion the district court said in passing that Porrata's testimony defending the settlement was "quite plausible". But it did not believe his explanation, despite this mild characterization, as it went on to hold that the consideration was "ridiculously inadequate". I have examined these ten grounds and agree with the lower court that the consideration for the settlement was grossly inadequate.

---

[2] The district court found that Ramón had the mental age of twelve years, with an intelligence quotient of 75%; he suffered from *oligophrenia* which is a form of mental deficiency; his conduct was guided by fortuitous emotion; he was mentally incapable of understanding a financial transaction involving thousands of dollars, or of determining whether he was receiving adequate compensation in settling a business transaction, or of estimating the true value of money; he was inclined towards being a moron; he was a mental weakling and a stupid person in the light of the average person in the community; he was very emotional and sensitive to any stimulus; and he was mentally abnormal.

The first ground is that in his will Pastor Díaz did not mention Ramón and disposed of the free third because he affirmed that he had no natural children. But preterition of Ramón in the will had no effect on his rights, provided he could establish his status in the filiation suit. Indeed, Ignacio himself filed suit to invalidate the will, and by agreement between him and the second wife of Pastor it was declared null.

The second ground is that the community property claim of Pastor's widow reduced the amount of the estate and threatened to involve Ignacio, Ramón and the widow in litigation. This point was not mentioned in the deed of settlement or in Porrata's testimony. It appears for the first time in the appellants' brief. In any event, even assuming the widow had a right to one-half of the estate as community property, Ramón's share was far in excess of $10,000.

The third ground is that there were outstanding accounts and obligations to liquidate before the estate could be distributed among the heirs. There is no evidence in the record as to the amount of these alleged obligations. The only evidence that does bear on this point is that when Ignacio filed the estate tax return, he had already deducted the outstanding debts of the estate. And he paid the tax on $76,053.21 which he declared in the return was Ramón's share. Consequently, even after deducting all outstanding obligations and participations, the share of Ramón, according to Ignacio's own declaration, was $76,053.21. And the other evidence in the case indicates that it was considerably larger.

The remaining grounds are equally untenable. Obviously, the liability of Ignacio for funeral expenses and for undisclosed but undoubtedly modest property taxes could not serve to make the consideration adequate. Likewise, speculation about costly judicial administration which never took

place and the threat of litigation against the estate, no details of which are given, cannot be invoked.

The appellants argue that these ten grounds made the settlement valid in the light of *McCormick* v. *McCormick*, 52 P.R.R. 669. In view of the foregoing discussion, the *McCormick* case is not in point. In addition, there was no suggestion or contention in the *McCormick* case either that the settlement was obtained by undue influence or that the consideration was grossly inadequate.

The appellants also argue that in view of the *Mc Cormick* case the lower court should have considered, on the issue of the adequacy of the consideration, the following: (1) revival of the filiation case, after it had languished for twenty-seven years, was debatable; (2) that suit contained testimony that Ramón's mother had sexual relations with other men during the period of his conception, and this Court reversed the judgment of the district court in favor of the plaintiff for that reason; (3) the reversal required a new trial, and it was this requirement of a new trial with all its legal implication which was the basis of the settlement; and (4) the plaintiff was not registered in the Registry of Vital Statistics and proof of his filiation was problematical.

I see no merit in (1) and (3). Under the circumstances of this case, Ramón was clearly entitled to a new trial in the filiation suit, despite the fact that the case had not actually been set for retrial for twenty-seven years.

As to (2), actually there was no such testimony at the first trial. There was an offer of proof which we held the lower court erred in not admitting. *Rivera* v. *Díaz*, 19 P.R.R. 524. And to complete the picture of the efforts to prevent the recognition of Ramón as an acknowledged natural child of Pastor Díaz, see *The People* v. *Díaz et al.*, 22 P.R.R. 177, and *In re Abella*, 25 P.R.R. 694.

As to (4), it is immaterial to this case—or to the filiation suit—whether or not Ramón was inscribed in the Registry of Vital Statistics.

Finally, the appellants rely on *Cabanillas* v. *Cabanillas et al.*, 33 P.R.R. 739, and *Sosa* v. *Sosa*, 35 P.R.R. 939. See also *Heirs of Gómez* v. *Colón, supra*, p. 102. Those cases hold that mere liberality or generosity among relatives is sufficient *causa* or consideration in the civil law. I find it difficult to believe that the appellants are serious in asking us to hold on this record that in executing the deed of settlement, Ramón, an almost illiterate, poverty-stricken, moronic, natural son of the testator was prompted by liberality toward Ignacio, the legitimate son of the wealthy decedent. In any event, the issue here is not whether there was sufficient *causa* to bind the parties. Rather I am seeking to determine if any undue influence took place. And on that issue, even though the consideration be technically sufficient, its gross inadequacy is substantial evidence of undue influence.

I am satisfied that most of the ten grounds advanced by the appellants to justify the settlement are afterthoughts. Indeed, the testimony of Porrata defending the settlement is in conflict with a letter discussed hereinafter in which Porrata says that at least $25,000.00 should have been received. I therefore agree with the lower court that the consideration for the settlement was grossly inadequate.

In view of the feeble-mindedness of Ramón, the grossly inadequate consideration and other facts shortly to be considered, the lower court held the deed of settlement null because of "fraud and undue influence". In other words, the deed was obtained by fraudulent undue influence on Ramón in order to benefit Ignacio and to prejudice Ramón. This is in accordance with the rule that undue influence is frequently, although not necessarily, fraudulent. 5 Williston, *supra*, § 1625, pp. 4540–41.

In its opinion the lower court made eleven findings which it called indicia of undue influence. Some of these referred to the mental condition of Ramón and the inadequacy of the consideration. The remainder referred to other circum-

stances tending to show undue influence. These findings were in substance as follows:

1. Ramón was anxious to obtain money, principally to acquire an automobile, motorcycle or airplane. Porrata catered to this desire by arranging on the day before the settlement to obtain a license for him to drive a motor vehicle.

2. The estate left by R. Pastor Díaz was valued at a large sum, whereas Ramón settled his rights therein for $10,000.

3. Ramón received only $5,000 from the settlement, the remaining $5,000 going to his attorneys.

4. The legitimate son and widow, their attorneys and the *attorneys for Ramón* all had their special reasons for terminating the suits. On the other hand, Ramón was highly impressionable and did not understand the scope of the settlement; his principal, if not his only, objective was to acquire an automobile, motorcycle or airplane.

5. Although Ramón received only $10,000, of which his attorneys retained $5,000, the estate tax return, made by Ignacio, declared that Ramón's share was $76,053.21. At the very least, this was defrauding the public treasury.

6. Porrata required Ramón's mother to sign the contract for his professional services, despite the fact that Ramón was of age. This tends to show that Porrata knew that Ramón was incapacitated or feeble-minded. (At this point the lower court added that it was not convinced that Ramón's mother was present when the deed of settlement was executed).

7. From the last days of November 1939 until the deed of settlement was executed on February 28, 1940, the expenses of Ramón and his mother while they were in Guayama were paid for by Porrata, before whom as a notary public the deed of settlement was executed.

8. The fact that the suit for filiation was being settled must be taken into consideration in view of the prohibition

in § 1713 of the Civil Code against settlement of suit involving civil status.

9. The preliminary agreement of settlement was signed only by Ramón. And it provided that Ignacio would not raise any obstacle or difficulty in the filiation suit. This demonstrates the parties were settling the case involving Ramón's civil status.[3]

10. Porrata insisted in his testimony that Rafael Cividanes had not participated in the settlement. The testimony shows the contrary. It shows that Cividanes took Ramón to Mayagüez and participated there and at other places in conversations involving the filiation suit and the estate. Four days after execution of the deed of settlement, Porrata wrote Cividanes that ". . . your actions in the case not only prejudiced me but compelled me to settle for $10,000 when I could have obtained $25,000 which was reasonably what ought to have been paid". This on its face is an admission by Porrata that, whatever his reasons might have been, he settled Ramón's claim for a grossly inadequate sum to the prejudice of Ramón.

11. The failure to utilize Ramón, who was present as a witness in the filiation suit, demonstrates that Porrata knew his mental condition.[4]

The lower court then said that "not only do we conclude that Ramón Díaz Rivera was a mental weakling, but also that in order to obtain his signature to the deed of settlement of February 28, 1940 undue influence by others was exercised on him." I think the lower court should have been

---

[3] As to findings 8 and 9, it is not necessary to determine if I agree that § 1713 was violated. As I point out subsequently, even if the settlement did not technically violate § 1713, its terms and the manner in which it was negotiated were indicia of undue influence.

[4] For purposes of clarity, I have paraphrased somewhat the language of the district court used in making these findings. In so doing, I do not believe I have changed their meaning. In any event, the statement of the findings of the lower court as rephrased by me is amply justified by the testimony.

more specific: it should have given the identity of "the others" who exercised the undue influence. But it is clear from the findings, the opinion as a whole and the testimony, that the district court meant that the undue influence had been exerted principally by Porrata.

In addition to the eleven findings of the lower court, I note the following:

1. Ramón repeatedly told all who would listen that the only thing he was interested in was getting an airplane or motorcycle, despite the fact that his alleged ⅓ share of an alleged $600,000 estate was involved.

2. Ramón's mother warned Porrata that Ramón was feeble-minded, incapacitated and could go nowhere alone. She and Porrata agreed she would be present if any deed of settlement were signed. Porrata himself seemed to think this was advisable when his own interests were involved: despite the fact that Ramón was of age, he had the mother as well as Ramón sign the agreement with him for his professional services. Porrata broke his agreement to have the mother present by having Ramón sign the deed when she was not present.

3. The parties entered into a preliminary agreement of settlement on January 19, 1940. The original document embodying this settlement was signed by Ignacio and Ramón and was retained by Agustín Font, counsel for Ignacio. The copy retained by Porrata was signed by Ramón but not by Ignacio. In practical effect, Porrata, with the knowledge of Font and Ignacio, thereby put Ramón in the position where Ramón but not Ignacio was bound by the preliminary agreement.

4. Ramírez Viñas, an attorney who was also acting as attorney for Ramón, testified that Porrata told him on February 28, 1940, in the presence of Ignacio and Font, that the case had been settled for $7,500; that he protested the sum was inadequate; and that Porrata replied that they were

engaged in conversations in an effort to raise it to $10,000. Porrata made these statements to Ramírez Viñas without protest from Ignacio and Font in the face of the fact that the preliminary agreement of settlement for $10,000 had already been executed on January 19, 1940.

5. The deed of settlement recites that $10,000 was being delivered to Ramón upon its execution. But he never received $10,000. He was given $500 in cash and a $4,500 certificate of deposit the day before the settlement. His attorneys received a certificate of deposit for $10,000. In addition to the light this sheds on the nature of the transaction, even if Porrata's services had been rendered faithfully to Ramón, he and his associates were scarcely entitled under the circumstances to fifty per cent of the amount of the settlement.

6. The appellants subpoenaed Font as one of their witnesses. However, despite the serious implications in the case as to the conduct of Porrata and Font, the latter did not testify in this case.

The eleven findings of the lower court, together with the episodes set forth in the last six paragraphs and the record as a whole, satisfy me that Porrata, Ignacio and Agustín Font, attorney for Ignacio, all knew prior to the settlement that Ramón was feeble-minded; that Ignacio knew the consideration was grossly inadequate; that Porrata, whatever his motives, was acting in the interests of Ignacio and not of Ramón; and that Ignacio and Font knew that Porrata was so acting.

Generally speaking, a finding of fraud may not be based on conjecture or suspicion. The proof must be solid, clear and convincing. *Serrano* v. *Torres*, 61 P.R.R. 157, 161; *Heirs of Gómez* v. *Colón, supra.* But a lower degree of proof is required to make out a case of undue influence, fraudulent or otherwise, where as here mental weakness is present. *Nelson et al.* v. *Doheny et al.*, 30 F.(2) 748 (C.C.A., D.C.,

1929) ; *Sulzberger* v. *Sulzberger*, 23 N.E.(2) 46 (Ill., 1939) ; *Moore* v. *Horne*, 136 S.W.(2) 638 (Tex., 1940). In addition, the lower court in effect found that Porrata was dealing with his feeble-minded client for the benefit of Ignacio. If an attorney deals with his client for the benefit of himself or of a third person, the burden is on him or the third person to show that the transaction was fair and that the agreement thereto by the transferor was his free act. *Lochinger* v. *Hanlon*, 33 A.(2) 1 (Pa., 1943) ; *Bliss* v. *Bahr, supra; Floyd* v. *Green, supra; Addis* v. *Grange*, 192 N.E. 774 (Ill., 1934) ; *Trustees of Jesse Parker Williams Hosp.* v. *Nisbet, supra; Egr* v. *Egr, supra;* 5 Williston, *supra,* § 1625A, pp. 4542–45, Restatement, Contracts, Vol II, § 498, p. 956. The appellants did not sustain that burden. On the contrary, the record shows that the settlement was unfair and that Ramón did not freely give his consent.

I note finally that even if Ignacio did not exert any undue influence himself, the fact that he knew of the undue influence for his benefit entitled the plaintiff to treat the settlement as null. See *Suárez et al.* v. *El Banco Territorial y Agrícola, supra,* p. 604; 5 Williston, *supra,* § 1622, pp. 4534–5; Restatement, Contracts, §496, p. 953, § 477, p. 912; *Addis* v. *Grange, supra;* Annotation, 96 A.L.R. 613.

The appellants argue that on the basis of "estoppel by deed and judgment" Ramón was estopped from annulling the deed of February 28, 1940. The theory of the appellants is that Ramón cannot be heard to say he was incapacitated on that date inasmuch as on the same day he had appeared in his own name in the filiation suit and obtained judgment therein. They rely on *The Plantations Co.* v. *Smith*, 23 P.R.R. 365, and *Figueroa* v. *Figueroa et al.*, 23 P.R.R. 405.

From my point of view, it is enough to dispose of this contention to say that I would not base the judgment in this case on lack of capacity of Ramón. Moreover, even if that issue is involved here by virtue of the opinion of the majority of this Court, it could not be settled by merely pointing to

an earlier suit in which the allegedly incapacitated person appeared as plaintiff in his own name.

The appellants argue that the statement of the lower court that the parties settled a suit concerning civil status, in violation of § 1713 of the Civil Code, 1930 ed., is unwarranted.[5] It is true the lower court made this statement, undoubtedly relying on *Pagán v. Heirs of Padilla,* 42 P.R.R. 941. In that case the parties signed and filed in the filiation suit in the district court an agreement by the parties in which the defendants "acquiesced" in the prayer that the plaintiff be declared a natural child. The agreement also contained a settlement of the inheritance rights of the plaintiff. We held the entire agreement was void because it violated § 1713.

Here the preliminary agreement of January 19, 1940 recited that part of the consideration was that Ignacio would not raise any obstacle or difficulty against the entry of judgment for Ramón in the filiation suit. This agreement virtually assured Ramón of a favorable judgment in the filiation suit. Indeed, the record shows that the trial was *pro forma.* Font, counsel for Ignacio, announced at the beginning of the trial that he had no witnesses. No one appeared for the second wife of Pastor Díaz. Ramón himself did not testify. Font did not cross-examine any of the witnesses, except for one or two irrelevant and trivial questions which he asked one witness. And the lower court, which apparently had not been advised of the settlement, seemed puzzled as to why default had not been noted. After the district court entered judgment in the filiation suit, on the same day the definitive deed of settlement was signed. Without mentioning the preliminary agreement of January 19, 1940, the deed of settlement recites that it was made in consideration of $10,000 and also in consideration of the fact that Ignacio made no objection in the filiation suit to the ruling that Ramón was an acknowledged natural child of Pastor Díaz.

---

[5] Section 1713 provides that "No compromise can be made with regard to the civil status of persons, nor with regard to matrimonial questions, nor future support."

Under the foregoing circumstances, it could perhaps be argued that the *Pagán* case applies and that the settlement herein was null because it violated § 1713. Cf. *Valdés v. Hastrup*, 64 P.R.R. 569. However, I find it unnecessary to decide this question as I prefer to rest our decision on other grounds. The lower court took a somewhat similar position. It did not declare the deed of settlement null on the ground that it violated § 1713. Instead of deciding the case on that basis, it said that the alleged violation of § 1713 was one of the indicia of undue influence, and predicated its decision on undue influence. I think the district court properly regarded those facts as an indicia of undue influence.

The appellants also complain of the ruling of the lower court that this action was not barred by prescription. The appellants contend that the suit is barred by § 1253, Civil Code, 1930 ed., which establishes a four-year statute of limitations. This suit was instituted approximately five years after execution of the deed of settlement. It is therefore barred if § 1253 applies.[6]

As we have seen, a contract obtained by undue influence vitiates the consent of the transferor. The latter may therefore at his option bring a proceeding to declare it null. The actions for nullity listed in § 1253 prescribe in four years. But this suit, predicated on a lack of consent by virtue of undue influence, is not included therein. Cf. *Oliver et al. v. Oliver*, 23 P.R.R. 168; *Cruz v. Heirs of Kuinlan*, 29 P.R.R.

---

[6] Section 1253 reads as follows:

"The action for nullity shall last four years.

"This term shall commence to run:

"In cases of intimidation or violence from the day on which it has ceased;

"In those of error or deceit or falsity of consideration, from the date of the consummation of the contract;

"When the purpose of the action is to invalidate contracts made by a married women, without consent or competent authority, from the date of the dissolution of the marriage;

"And when it refers to contracts executed by minors or incapacitated persons, from the date they were released from guardianship."

817; *Solá* v. *Castro et al.*, 32 P.R.R. 740; *González et al.* v. *Fumero et al.*, 38 P.R.R. 497. Consequently, this action would prescribe only after fifteen years under § 1864 of the Civil Code. It was therefore brought in ample time and the defense of prescription does not lie.

Indeed, not the least of the virtues of the doctrine of undue influence is that it avoids the effect of an extremely harsh statute of limitations. Under § 1253 prescription begins to run when the contract was consummated and not as it would when the deceit is discovered. As a result, § 1253 as now written pays a premium for concealment of deceit.

Of course, the best answer to this whole problem would be for the Legislative Assembly to insert undue influence in § 1217 as a ground for making consent null and to amend § 1253 to provide that the statute of limitations begins to run from the date of the discovery of the grounds of nullity rather than from the date of consummation of the contract. In view of the laudable interest which the Legislature has manifested in recent years in the rights of natural children, I do not think it amiss for me to call this matter to its attention.

Finally, the appellants argue that the judgment was erroneous because the pleadings did not allege undue influence, but alleged only mental incapacity and fraud. Alleged errors of pleading of this type are no longer permitted at this stage of a case to affect the result of litigation in this jurisdiction. Rule 15(*b*), Rules of Civil Procedure. See *Nuñez* v. *Benítez, Chancellor*, 65 P.R.R. 812; *López* v. *Saldaña*, 68 P.R.R. 897.[7]

I think the judgment should be affirmed for the reasons given herein.

---

[7] In view of my discussion of the conduct of Porrata Doria, I need hardly add that I join the majority of the court in ordering an investigation thereof.